FILED

2015 Sep-23  AM 11:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHARNETTA GADLING-COLE,  )
                                         )
       **Plaintiff,**  )
                                           )
     **vs.**  )       **CASE NO. 2:12-CV-2882-SLB**
                                         )
THE BOARD OF TRUSTEES OF  )
THE UNIVERSITY OF ALABAMA,  )
                                         )
       **Defendant.**  )
                                         )

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 58.)[1]  Plaintiff Charnetta Gadling-Cole has sued her former employer, defendant the Board of Trustees of the University of Alabama,[2] alleging that the Board

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record. Page numbers for documents refer to the page number assigned by the court's CM/ECF system, except as otherwise indicated.

[2] Plaintiff brought this claim against the University of Alabama at Birmingham. (Doc. 30 at 1.) She filed a Motion to Amend, to which she attached a Fourth Amended Complaint, in which she named the University of Alabama at Birmingham Board of Trustees. (*See* doc. 47-1 ¶ 4.) The University of Alabama System has one Board of Trustees, which governs operations at all three campuses within the system – Tuscaloosa, Huntsville, and Birmingham. *See* The Board of Trustees at <<http://uasystem.ua.edu/board-of-trustees>> ("Established in 1969, The University of Alabama System includes The University of Alabama (located in Tuscaloosa), The University of Alabama at Birmingham, and The University of Alabama in Huntsville. The System is governed by a self-nominating Board of fifteen elected and two ex-officio members."). There is no separate entity known as the University of Alabama at Birmingham Trustees. The proper entity to be named as a defendant in this action is the Board of Trustees of the University of Alabama. (*See* doc. 49 at 2.)

discriminated against her on the basis of her race.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Board's Motion for Summary Judgment, (doc. 58), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. STATEMENT OF FACTS

The facts set forth in the defendant's Brief in Support of the Motion for Summary Judgment, (doc. 59), are deemed admitted. Exhibit A to the court's Scheduling Order states:

> The first section [of the non-moving party's response to a Motion for summary judgment] must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the moving party's claimed undisputed facts. Any fact that is disputed by the non-moving party must be

> followed by a specific reference to those portions of the **evidentiary record** upon which the dispute is based.  All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.

(Doc. 43-1 at 4 [emphasis added; original emphasis omitted].)  In Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Gadling-Cole contends, "Plaintiff disagrees with Defendant['s] [S]tatement of Facts as it relates to statement #34.[3]  Plaintiff states she was terminated based on her race (Doc. No. 49, p. 2)."  (Doc. 65 at 3 [footnote added].)   Document 49 is this court's Order striking Gadling-Cole's Fourth Amended Complaint.  (*See generally* doc. 49.)   The entirety of page two of document 49, cited as Gadling-Cole's evidentiary support for her claim that she was terminated because of her race, provides the following:

> Defendant argues that the individual parties dismissed without prejudice by the court's March 19, 2015 Order will suffer prejudice because "this matter [is] on a fast track due to its age," and each individually named defendant must be re-served with a summons if the court grants plaintiff's Motion to Amend. ([Doc. 48] at 4.)  Defendant also argues that the Board will be prejudiced by the amendment because there is insufficient time to investigate all new allegations contained in the Fourth Amended Complaint.  (*Id.* at 5.)  Further, defendant contends that "due to the current deadlines in the Scheduling Order, it would be prejudicial to the proposed individual Defendants, and the Board, to have to proceed in defending the claims against them before the Court even had a chance to determine if the individual Defendants were immune from

---

[3]Paragraph 34 states, "Based on Plaintiff's overall performance as a faculty member in 2009, 2010, 2011, and the Spring of 2012, Dr. Baker made the decision to not renew the Plaintiff's appointment as a UAB faculty member and to end Plaintiff's employment effective May 15, 2013."  (Doc. 59 at 9 [citing doc. 60-2 ¶¶ 45-51, 54, 62-66; doc. 60-3 ¶ 41; doc. 60-4 ¶ 21].)

suit." (*Id*. at 5-6.)   Additionally, defendant notes that plaintiff added "substantially new factual allegations in support of multiple new claims" and that "[t]hese lengthy and significant new factual allegations are exactly the kind of supporting facts this Court has been admonishing Plaintiff to assert for the last 20 months." (*Id*. at 6.)

> The court finds that granting plaintiff's Motion to Amend would be substantially prejudicial to all named defendants in the Fourth Amended Complaint.   Therefore, plaintiff's Motion is **DENIED**, and plaintiff's proposed Fourth Amended Complaint is **STRICKEN WITH PREJUDICE**.   Hereafter, this case is proceeding under Count One, the only remaining claim from plaintiff's Third Amended Complaint, (Doc. 30), which plaintiff asserted against The Board of Trustees of the University of Alabama (again, incorrectly named in the Third Amended Complaint as both "University of Alabama at Birmingham" and "The Board of Trustees of the University of Alabama at Birmingham").

(*Id*. at 2 [emphasis in original].)   Needless to say, this page of the court's Order provides no evidentiary support for Gadling-Cole's contention that plaintiff was terminated because of her race, and, therefore, it provides no ground to dispute paragraph 34 of defendant's Undisputed Relevant Material Facts.

Therefore, the following facts, set forth in defendant's Undisputed Relevant Material Facts, are deemed admitted for purposes of deciding its Motion for Summary Judgment:

> 1.   In July, 2005, Dr. Lisa R. Baker ("Dr. Baker") accepted an appointment at the University of Alabama at Birmingham ("UAB") as an Assistant Professor (full-time, tenure earning) in the Department of Anthropology & Social Work. [(Doc. 60-2 ¶ 9.)]   Dr. Baker's initial appointment was for a two (2) year period, renewable annually.   [(*Id*.)]

> 2.   Dr. Baker was hired at UAB by Professor and Chair of the Department of Anthropology & Social Work, Christopher Taylor, Ph.D. [(*Id*.)]

3.  At the time she was hired by UAB Dr. Baker already had her Ph.D. for seven years.  [(*Id*. ¶ 10.)]

4.  At the time she was hired by UAB as an Assistant Professor, Dr. Baker already had three (3) refereed (i.e. peer reviewed) publications; two (2) non-refereed publications; four invited publications, and a history of funded research projects and awards.  [(*Id*. ¶¶ 23-26.)]

5.  Dr. Baker worked for UAB as an Assistant Professor in the Department of Anthropology & Social Work until September, 2011.  [(*Id*. ¶ 11.)]  As an Assistant Professor she reported to Chris Walker (black female) and Chris Taylor (white male).  [(*Id*.)]

6.  On March 15, 2011, Thomas Di Lorenzo, Dean of the College of Arts and Sciences ("CAS") at UAB, recommended to Dr. Eli I. Capilouto, Provost, that Dr. Baker be promoted to Associate Professor with tenure.  [(*Id*. ¶ 16.)]  Provost Capilouto subsequently agreed with the recommendation and granted Dr. Baker's application for tenure and promotion.  [(*Id*.)]

7.  In October, 2011, Dr. Baker received tenure from UAB and was promoted to Associate Professor.  [(*Id*. ¶ 17.)]

8.  Between 2005, the year Dr. Baker was hired at UAB, and 2011, Dr. Baker was awarded six funded research awards as the Principal Investigator.  [(*Id*. ¶ 27.)]

9.  In 2005, the year Dr. Baker was hired at UAB, Dr. Baker had a refereed (peer-reviewed) publication.  [(*Id*. ¶ 29.)]

10.  Between 2005 and 2011 Dr. Baker submitted an additional nine grant proposals, eight of which Dr. Baker was the Principal Investigator.  [(*Id*. ¶ 28.)]

11.  On January 1, 2011, Dr. William C. Cockerham (Dr. Cockerham") replaced Dr. Mark LaGory ("Dr. LaGory") as Interim Chair of the Department of Sociology and Social Work.[4]  [(Doc. 60-3 ¶ 9.)]

---

[4]Effective October 1, 2009, the Social Department merged with the Sociology Department.  (Doc. 60-1 at 90.)

12.   At the time Dr. Baker was promoted to Associate Professor, Dr. Cockerham was the Chair of UAB's Department of Sociology & Social Work. [(Doc. 60-2 ¶ 17.)]

13.   The Department of Sociology & Social Work was part of the University of Alabama at Birmingham's ("UAB") College of Arts and Sciences ("CAS").  [(Doc. 60-3 ¶ 8.)]

14.   In October, 2011, UAB's Department of Sociology and Social Work split and became two departments.  [(Doc. 60-2 ¶ 18; doc. 60-3 ¶ 10; doc. 60-4 ¶ 18.)]  The Department of Social Work became its own department. [(Doc. 60-2 ¶ 18; doc. 60-3 ¶ 10; doc. 60-4 ¶ 18.)]  The Department of Sociology became its own department.  [(Doc. 60-2 ¶ 18; doc. 60-3 ¶ 10; doc. 60-4 ¶ 18.)]  Both Departments remained part of the CAS.   [(Doc. 60-2 ¶ 18; doc. 60-3 ¶ 10; doc. 60-4 ¶ 18.)]

15.   In October, 2011, after UAB's Department of Sociology and Social Work split into two separate departments, Dr. Cockerham decided to step down as Interim Chair.  [(Doc. 60-2 ¶ 21; doc. 60-3 ¶ 12.)]  The Department of Social Work then needed a Chair.  [(Doc. 60-3 ¶ 12.)]

16.   Dr. Baker did not want to be Chair of the Department of Social Work, but at the urging of faculty said she would accept that position.  [(Doc. 60-2 ¶ 21.)]

17.   Dr. Baker was appointed by the CAS Dean, Thomas M. DiLorenzo ("Dr. DiLorenzo"), to the position of Chair of the Department of Social Work effective October 1, 2011.  [(Doc. 60-2 ¶ 22; doc. 60-3 ¶ 13; doc. 60-4 ¶ 19 and at 19-20.)

18.   Dr. Baker served as Chair of the Department of Social Work for approximately 14 months and then voluntarily stepped down.  [(Doc. 60-2 ¶ 22; doc. 60-3 ¶ 13.)]

19.   After Dr. Baker stepped down from the position of Chair of the Department of Social Work Dr. Cockerham resumed the role as Interim Chair of the Department of Social Work until December 31, 2013.  [(Doc. 60-2 ¶ 22; doc. 60-3 ¶ 13.)]

20.   On March 2, 2009, the Plaintiff was offered a full-time, tenure earning appointment as an Assistant Professor in UAB's Department of Sociology and Social Work that would be effective August 15, 1999.  [(Doc. 60-3 ¶ 17 and at 31; doc. 60-4 ¶ 12.)]

21.   Plaintiff's initial appointment as an Assistant Professor was for a two-year period, renewable thereafter on an annual basis for five years or until tenure was granted.  [(Doc. 60-3 ¶ 17.)]

22.   Under the terms of Plaintiff's employment with UAB, and pursuant to the provisions of the UAB Faculty Handbook, a tenure decision regarding Plaintiff would be made no later than the end of the sixth year of employment, which would have been August 2015.  [(Doc. 60-3 ¶ 18; doc. 60-4 ¶ 13.)]

23.   If tenure was not awarded at the end of the sixth year, Plaintiff's appointment would have been terminated May 14, 2016, which was the end of the seventh academic year of employment.  [(Doc. 60-3 ¶ 18.)]  Tenure requirements cover teaching, research, and service obligations.  [(*Id.*)]

24.   When Plaintiff was hired by UAB she had not yet completed her Ph.D.  [(Doc. 60-2 ¶ 43; doc. 60-3 ¶ 19.)]

25.   Plaintiff was informed in her March 2, 2009, appointment letter[5] that if she did not complete the requirements for her doctoral degree by August 15, 2009, her appointment would revert to the rank of Instructor.  [(Doc. 60-3 ¶ 20; doc. 60-4 ¶ 13.)]  The appointment as an Instructor would be for one year.  [(Doc. 60-3 ¶ 20; doc. 60-4 ¶ 13.)]  If she had not completed the requirements for the doctoral degree by February 15, 2010, her appointment at UAB would not be extended past the initial two year period.  [(Doc. 60-3 ¶ 20; doc. 60-4 ¶ 13.)]

26.   On July 7, 2010, Dr. LaGory issued Plaintiff a letter as a counseling regarding her performance as a faculty member.  [(Doc. 60-1 at 91-92.)]  Dr. LaGory's letter stated Plaintiff's 2009 performance was "good to average", but the Plaintiff "did not meet the principle expectations outlined in [her] contract . . . ."  [(*Id.* at 91.)]  Plaintiff admitted nothing was incorrect about Dr. LaGory's letter.  [(Doc. 60-1 at 13 [Gadling-Cole Depo. at 45-46].)]

---

[5](*See* doc. 60-3 at 31-32.)

27. Plaintiff failed to provide evidence of a doctoral degree by the February 15, 2010, deadline.[6]  [(Do. 60-3 ¶ 21; doc. 60-4 ¶ 14.)]  After several approved extensions, she was issued a notice of termination of employment dated October 14, 2010, by Dr. LaGory, the Department of Sociology and Social Work Chair, and Dean DiLorenzo.  [(Doc. 60-3 ¶ 21; doc. 60-4 ¶ 14.)]  This letter stated Plaintiff's last day with UAB would be May 14, 2011.  [(Doc. 60-3 ¶ 21; doc. 60-4 ¶ 14 and at 12.)]

28. Shortly after receiving the October 14, 2010 letter, Plaintiff successfully defended her dissertation for a Ph.D. from Howard University.  [(Doc. 60-3 ¶ 22; doc. 60-4 ¶ 15.)]  Plaintiff received another letter from Dr. LaGory, dated November 19, 2010, acknowledging this accomplishment and informing her the Department needed an official transcript and clarification on her teaching schedule for the 2011 Spring semester.  [(Doc. 60-3 ¶ 22; doc. 60-4 ¶ 15 and at 14.)]

29. On June 7, 2011, Dr. Cockerham gave Plaintiff her 2010 annual faculty evaluation.[7]  [(Doc. 60-3 ¶ 31 and at 43-44.)]

---

[6] In her Brief in Opposition to Defendant['s] Motion for Summary Judgment, Gadling-Cole alleges that she was informed she was pregnant in January 2010.  (Doc. 65 at 18.)  She has not pointed to any evidence why she was unable to meet the deadline for completing her Ph.D. requirements by February 2010.

[7] This evaluation stated, in part –

You had no publications in 2010, but have a book contract and two articles invited for revision and resubmission.  You are the only tenure-track faculty member in the department who did not publish anything in 2010.  Consequently, your research [output] this year has not been noteworthy with respect to published work; it is recognized, however, that you were pregnant and also finished your Ph.D. dissertation at Howard University.  You worked on publishing, nonetheless, and this effort should pay off in 2011.

. . .

You had a teaching load of five courses.  For the Spring Semester, you taught SW 203 with a 4.0 score and SW 321 (Statistics for Social Work Research) with a very low student . . . evaluation [score] of 2.1 that was the lowest in the Department for any course taught by our faculty.  This score was likely

30.   On July 19, 2011, Dean DiLorenzo sent Plaintiff a letter offering her a full-time regular appointment at UAB as an Assistant Professor in the Department of Sociology and Social Work in the CAS.  [(Doc. 60-4 ¶ 16 and at 16.)]

31.   Dean DiLorenzo's July 19, 2011[,] letter stated Plaintiff was receiving a tenure-track appointment with the term of her appointment to begin on August 15, 2011[,] and extending through May 14, 2012, and Plaintiff was responsible to Dean DiLorenzo and the Department Chair.  [(Doc. 60-4 ¶ 17 and at 16-17.)]

---

affected by the subject matter and perhaps by your pregnancy, but nonetheless it was much lower than the score for your other course (SW 203) that was taught at the same time.  Teaching statistics may not be one of your strengths.

. . .

You also taught eight independent study courses.  Given the many demands on your time, teaching so many of these courses is probably not a good idea.  You need to focus on your regular courses and publication.

Only the raw score in the student evaluations is reviewed since what is measured by the adjusted score on the IDEA Short Form has not been accurately determined.  Overall, your course evaluations are mixed, ranging from a high of 4.9 to a low of 2.1.  What is suggested by those evaluations is that your teaching online is received better by students than your classroom teaching.  You need to be aware of this when you go back into the classroom and try to produce consistent results in both settings, especially if you teach statistics again.

In sum, the chair's view is that you had a positive record in 2010 and potential for the future.  You will be promoted to Assistant Professor on 1 October, 2011, and will need to publish regularly, continue your active level of service, and be attentive to making any changes in teaching you think could be worthwhile in order to have consistently good evaluations.

(Doc. 60-3 at 43-44.)

32.   On April 27, 2012, Dr. Cockerham gave Plaintiff her 2011 annual faculty evaluation which covered the period of time he supervised Plaintiff in 2011.[8]  [(Doc. 60-3 ¶ 37 and at 58-59.)]

---

[8]This evaluation, which covers the period of January 2011 through September 2011, states in pertinent part:

Your 2010 evaluation was ranked as positive (satisfactory), but not excellent or outstanding as you received a particularly low student evaluation (2.1) for SW 321 (Statistics for Social Work research) that was the worst in the department by far and [you] were the only tenure-track faculty member with no publications in print.  You were ranked this way because your other course evaluations were satisfactory, you showed activity with respect to publications, and you held the low faculty rank of instructor.  It was pointed out to you at the time that you needed to improve in both teaching and research/publication since you had completed your doctorate and were being promoted . . . .

Therefore, you were made aware of the requirement on your part to have a strong year for 2011 in our last conversation, although you subsequently broke off all contact with me in June, 2011, in part because you disagreed with my 2010 evaluation, which included face-to-face meetings, non-attendance at faculty meetings, and unanswered emails.

You taught a total of three courses online (nothing in the classroom) during the period when you were part of the combined sociology-social work department. Your raw score[ ] for student evaluations for SW 203 (Social Welfare History) [was] 3.8 in the spring and for two summer courses, SW 200 (Professional Writing) and SW 203 (Social Welfare History), your scores were 4.1 and 3.8 respectively.   While satisfactory, none of these evaluations equaled or exceeded the overall *average* for the department for this time period (4.3 for Spring, 4.2 for Summer).  Evaluations for your online courses show a need for some improvement to at least match the department's average, while your classroom performance is not rated.

. . .

You had no publications prior to October, 2011.  However, it was my understanding you were expecting a publication soon as a co-author in an unranked (by SSCI) social work journal (*Journal of Global Social Work*

11

33.  On May 11, 2012, Dr. Baker gave Plaintiff her 2011 annual faculty evaluation which covered the period of time Dr. Baker supervised Plaintiff in 2011.[9]  [(Doc. 60-2 ¶ 62 and at 90-91.)]

_____

*Practice*) and a book to be published by Adonis and Abby whose quality is unknown.

In sum, your overall level of contribution during the [first] ten months in 2011 in which you were a member of the combined department was the lowest of any serving faculty member.    Moreover,   you   showed   yourself   to   be extraordinarily uncooperative in discussing faculty business and ignored attempts to offer you advice to improve your situation.

Consequently, I find your performance as a faculty member for the first ten months of 2011 to be unsatisfactory and recommend that your current department chair not reappoint you to a faculty position.

(Doc. 60-3 at 58-59 [emphasis in original].)

[9]The evaluation prepared by Baker stated, in part:

Research/Scholarship

In 2011 you had one publication as first-author in the *Journal of Global Social Work Practice*, an online, open-access peer review journal.  You also had the publication of a book that you had written prior to your appointment as Assistant Professor.  According to your FIF you did not submit any articles for review in 2011 although you mention some that are in progress for 2012. Given the publication process in social work journals you should be aiming for 1-2 publications in print or accepted for publication per year in order to establish a research trajectory of accomplishments at UAB.

. . .

Your scholarly productivity over the past year has been low, in spite of significant mentoring and workload reduction through the scholars['] programs.  In addition, feedback that was received by the Center for Aging reflected that you did not fulfill the requirements of either program, and that there were significant concerns about your research and your willingness to accept guidance and mentorship.  While it is important that you continue to try

34.   Based on Plaintiff's overall performance as a faculty member in

to obtain funding it is also critical that grants and training awards result in publications and that your efforts support a positive relationship between our Department and other Centers on campus.

Teaching

In 2011 you had a teaching load of 5 courses. . . .  In Fall you taught SW 200 with a score of 3.8 and SW 205 with a score of 4.2.  Your teaching scores are among the lowest in the Department.  According to T & P guidelines student evaluation[s] should be in the average to higher range of scores.  Your scores are in the average to below-average range.  Student comments are mixed, with positive as well as negative comments.

. . .

Service

. . .

In spite of strong service [to the community and the profession,] however, your service to the Department needs significant improvement.  You often delay or refuse to provide substantive input on issues.  You often begin a task (such as policy development) but then do not follow-through in a timely manner or fail to complete, resulting in other faculty needing to assume tasks on your behalf in spite of the additional burden it places on their workload.   You regularly miss office hours and faculty meetings in spite of special accommodations for your schedule and refuse to comply with requests made by the Chair.  This was most recently evidenced by your refusal to submit requested documentation for this evaluation.   In December, specific performance behaviors were brought to your attention in a meeting with CAS HR.  You have yet to resolve or make progress on the improvement of these behaviors.   In addition you often disregard the [c]hain of administration and act on your own on issues that reflect on the Department.

Overall you have failed to achieve sustained, cooperative, and contributing effort in departmental service as required for tenure and promotion.

(Doc. 60-2 at 90-91.)

13

2009, 2010, 2011, and the Spring of 2012, Dr. Baker made the decision to not renew the Plaintiff's appointment as a UAB faculty member and to end Plaintiff's employment effective May 15, 2013.   [(Doc. 60-2 ¶¶ 45-51, 54, 62-66; doc. 60-3 ¶ 41; doc. 60-4 ¶ 21.)]

35.   On May 11, 2012, Dr. Baker gave Plaintiff notice that Plaintiff's appointment as an Assistant Professor would not be renewed[10] and that

---

[10]The letter to Gadling-Cole stating the reasons for the decision sets forth the following:

The decision for non-renewal is based on the following performance behaviors:

1.      You have generated only one peer[-]review publication in the past year and do not currently have any publications under review for the upcoming year.

2.      You have failed to meet required workload obligations in the Department and have failed to fulfill requirements of other campus training programs and obligations. . . .

3.      Your teaching evaluations are in the average to below average range.

4.      You have failed to demonstrate a record of sustained, cooperative, and contributing effort in departmental, school and university work and have failed to engage as an active member in Department service or required activities.   You often fail to complete Department workload requests that are part of your job description and are non-compliant with UAB policies and procedures.

5.      You have violated and disregarded the necessary chain of administration and acted on your own without obtaining approval for activities that impact the Department, or imply Department support.

6.      You consistently do not comply with requests from the Chair and openly exhibit insubordinate, disrespectful and antagonistic behaviors and communication.   Such behavior is in violation of the UAB Code of Conduct.

14

Plaintiff's last day of employment with UAB would be May 15, 2013.  [(Doc. 60-2 ¶ 64 and at 94.)]

36.  Plaintiff's employment with UAB ended on May 15, 2013.  (Doc. 60-1 at 21 [Gadling-Cole Depo. at 80]; doc. 60-2 ¶ 63; doc. 60-12 at 2.)]

37.  Plaintiff filed four EEOC Charges regarding the alleged discriminatory treatment by UAB during her employment, with said Charges being dated July 6, 2011; October 6, 2011; November 15, 2011; and February 13, 2012.  [(Doc. 60-1 at 77-85.)]

38.  Plaintiff filed her Third Amended Complaint on May 15, 2014. [(*See* doc. 30.)]

39.  Pursuant to this Court's May 19, 2015 Order, this case is proceeding under only Count One of Plaintiff's Third Amended Complaint. [(Doc. 49 at 2.)]

(Doc. 59 at 3-10 [footnotes added].)

On July 8, 2011, Gadling-Cole filed an EEOC charge, alleging sex and race discrimination and retaliation.  (Doc. 60-1 at 77.)  She alleged that Lagory and Cockerham had harassed her and that they had failed to rewrite her contract to reflect that she had received her Ph.D.  (*Id*.)

On October 6, 2011, Gadling-Cole filed a second EEOC charge in which she alleged race discrimination and retaliation from August 4, 2011 through September 29, 2011.  (*Id*.

---

These issues have been repeatedly addressed and resources extended to assist in correcting these behaviors.  You have failed to correct, or take appreciable steps to correct these issues, and have declined offers of mediated discussion to reach resolution.  As a result your behaviors reflect negatively on the Department and have created an uncomfortable work environment.

(Doc. 60-2 at 94.)

at 79.)  In this charge, she alleged that Cockerham had not submitted a letter of support for her grant proposal, he had not submitted the required paperwork for an international course she had developed, her on-line course was overloaded, she was denied relief time to participate in certain programs, she did not get credit for or get paid for twelve independent study courses, she did not receive a raise, and she did not receive information about the transition to the social work department.  (*Id*. 79-80.)

On November 14, 2011, she filed a third EEOC charge.  (*Id*. at 82.)  In this charge she alleged that Dr. Baker retaliated against her, gave her false information in an attempt to sabotage her proposed international center, and she "attempted to be unaware" of Gadling-Cole's Kenya Coalition research agenda.  (*Id*.)  Gadling-Cole also alleged that Dr. Baker was denying her "protected time" and adding administrative tasks to her work load.  (*Id*.)

On February 13, 2012, Gadling-Cole filed a fourth EEOC charge.  (*Id*. at 84.)  The charge alleged Baker had retaliated against her by giving her a written warning, making false statements about her, removing her teaching assignment for a professional writing course, sending her an harassing email, and telling Gadling-Cole that she was not trusted because she had filed EEOC charges.  (*Id*.)

Gadling-Cole did not file an EEOC charge alleging that her lack of mentoring and her termination had been motivated by her race.

The EEOC issued right-to-sue letters on all four EEOC Charges on June 6, 2012. (*Id.* at 78, 81, 83, 85.)  Thereafter, on September 4, 2012, Gadling-Cole filed the instant action. (*See generally* doc. 1.)

The only remaining claim in this case is a claim for race discrimination in violation of Title VII against the Board as set forth in Gadling-Cole's Third Amended Complaint, which states:

> 30.   Defendant UAB has discriminate[d] against the Plaintiff on the basis of her race in violation of Title VII with regards to pay, job and work assignments, discipline, evaluations, [t]ransfers and in all other conditions of employment.
>
> 31.   On May 11, 2012, Plaintiff had her faculty appointment as Assistant Professor with the Department of Social Work cancelled and was told that her last day of employment would be May 15, 2013.
>
> 32.   Caucasian faculty member, Lisa Baker [white female], who upon information and belief, had [a] less accomplished history of research, service, and teaching was allowed to remain employed.  Moreover, during the tenure process, Dr. Baker received mentoring denied the Plaintiff and was allowed to skip the requirement of publishing during the first two-years of her initial contract.   Upon information and belief, Dr. Baker was treated more advantageously than the Plaintiff because of her race.
>
> 33.   As a direct and proximate result of Defendant['s] conduct, Plaintiff has suffered and will continue to suffer lost wages and benefits, mental anguish, emotional distress, and other damages due to Defendant['s] acts . . . .   Defendant['s] acts were intentional and/or taken with reckless indifference to Plaintiff's federally[-]protected rights, thus entitling Plaintiff to an award of non-pecuniary damages.

(Doc. 30 ¶¶ 30-33.)

## III. **DISCUSSION**

Because Gadling-Cole relies upon circumstantial evidence to prove her claims,[11] the court's analysis is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). The Supreme Court has explained this framework as follows:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .
>
> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a

---

[11]Gadling-Cole makes reference to other methods of proving a prima facie case of discrimination – direct evidence and statistical proof, (doc. 65 at 12-13); however, she has submitted no evidence – circumstantial, direct, or statistical – in support of her claim. She filed a cover sheet for plaintiff's "Exhibit 1. Affidavit of Dr. Cathy McElderry." (Doc. 65-1.) However, nothing was filed with the cover sheet. (*Id.*)

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that [she] was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 142-43 (internal citations and quotations omitted).

### a. Race Discrimination Prima Facie Case[12]

The Board contends that Gadling-Cole's race discrimination claims are due to be dismissed because she cannot identify a proper comparator. (Doc. 59 at 14-19.) Gadling-Cole argues that she was treated less favorably than Lisa Baker, a white Associate Professor and Chair of the Department of Social Work at the time Gadling-Cole was terminated, with regard to mentoring and termination. (*See* doc. 65 at 13-16.) She does not name a specific white professor or instructor treated more favorably with regard to her claims based on (1) payment for teaching a summer course, (2) Cockerham's initial refusal to write a letter supporting her request for a faculty development grant, (3) the termination of her graduate assistant, (4) over-booking her class, and (5) failure to pay her for developing a course/failure to pay her for teaching independent study courses. (*Id*. at 16-17.)

---

[12]The court notes that Gadling-Cole's EEOC Charges were filed before her termination and she did not amend her charge or file a new charge following her termination. Also, she never complained about a lack of mentoring in any of her four EEOC charges. Therefore, her Title VII claims based on these employment actions appear to be barred by her failure to exhaust her administrative remedies. *See Duble v. FedEx Ground Package System, Inc.*, 572 Fed. Appx. 889, 893 (11th Cir. 2014). However, the Board has not moved to dismiss these claims based on Gadling-Cole's failure to exhaust her administrative remedies; therefore, the court considers this ground for dismissal to have been waived.

"[A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) [she] belongs to a racial minority; (2) [she] was subjected to [an] adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(citing, *inter alia*, *McDonnell Douglas Corp.*, 411 U.S. at 802).

With regard to plaintiff's prima facie case, the parties dispute only whether Gadling-Cole can show the Board treated a similarly-situated white employee more favorably than it treated Gadling-Cole.[13]  Thus, the court now turns its attention to whether, for each alleged adverse employment action Gadling-Cole can show a similarly-situated white employee was treated more favorably.

### i.  Payment for Teaching a Summer Course

Gadling-Cole argues, "Plaintiff's position is that based upon past practices and the information that had been provided to her she expected payment." (Doc. 65 at 16 [citing doc. 60-1 at 30 (Gadling-Cole Depo. at 116)].)  In her deposition, Gadling-Cole testified that Chris Walker "indicated" that she would be paid for teaching two courses in the summer.

---

[13]Defendant does not argue that one or more of plaintiff's alleged adverse employment actions did not rise to the level of an actionable employment action.  In Title VII race discrimination cases, "An employment action is considered 'adverse'" – and thus actionable – "only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001).  Although it seems unlikely that some of Gadling-Cole's alleged wrong-doing had any tangible and/or negative effect on her employment, defendant has not so argued.  Therefore, the court assumes that the alleged actions are actionable.

(Doc. 60-1 at 30 [Gadling-Cole Depo. at 116].)  The Board presented sworn testimony that plaintiff taught two classes in the summer of 2011 because she was required by "CAS teaching load requirements" to teach two classes in Spring 2011, but she had only taught one. (Doc. 60-3 ¶ 29.)  "Accordingly, [Gadling-Cole taught two courses in the summer, but received payment for only one." (*Id*.)  Cockerham testified that all faculty "have had to make up courses owed to the Department without additional pay." (*Id*.)  Gadling-Cole has not disputed this testimony or otherwise shown a white employee was treated more favorably.

The court finds that Gadling-Cole has not demonstrated that she was treated less favorably than a white employee with regard to compensation for teaching a summer class. Therefore, summary judgment will be granted as to this claim.

## ii. Payment for developing a course and independent study

In the section of her brief responding to the Board's motion to dismiss her claim based on failure to pay her for independent study courses she taught, Gadling-Cole argues that the Board pays white instructors for developing courses.  (Doc. 65 at 17 [citing doc. 60-1 at 30 (Gadling-Cole Depo. at 116)].)   In her deposition, Gadling-Cole testified that all white employees that had developed courses were paid, however, she did not identify any such white employee by name. (Doc. 60-1 at 30-31 [Gadling-Cole Depo. at 116-17].)  She did not identify anyone who had been compensated for taking on independent study students.  (*See id*.)  According to Cockerham, the Board does not pay faculty to develop courses.  (Doc. 60-3

¶ 30.)  Baker testified that she has never been compensated for taking on independent-study students and she did not know of anyone who had been so compensated.  (Doc. 60-2 ¶ 56.)

The court finds that Gadling-Cole has not demonstrated that she was treated less favorably than a white employee with regard to compensation for independent study courses or developing a course.  Therefore, summary judgment will be granted as to this claim.

### iii.  Cockerham Recommendation

Gadling-Cole argues that Cockerham initially refused to support her in recommending a grant proposal.  (Doc. 65 at 16 [citing doc. 60-3 at 40, 41].)  She contends, "Plaintiff['s] position is that the normal procedure was to support a professor['s] proposal, however Dr. Cockerham had to be pressured to support [her] proposal."  (*Id*. at 16-17.)  The court notes that the emails referenced by Gadling-Cole actually refute her claim that Cockerham "refused" to recommend her proposal and "had to be pressured" into supporting it.[14]  (*See*

---

[14]Gadling-Cole sent Cockerham an email on Saturday, March 12, 2011, asking him for a letter of support for her faculty-development proposal.  (Doc. 60-3 at 41.)  On Monday, March 14, 2011, Cockerham responded as follows:

In reference to your proposal:

1.  Fix this sentence: ["]was la offers comprehensive report[."]

2.  Your budget is $8,840, with $5,000 coming from the school (change to College and list correct College rep's name (Scott Snyder)[)].  Snyder says the College and Department will split the $5,000 match.  However, since social work and sociology are dividing, I can't justify using $2,500 from sociology's special projects fund and social work does not have the money in its part of the budget.  There have not been returns to the Department from grant indirect costs from social work.  Are you planning on contributing $2,500 from your

22

doc. 6-3 at 40-41.)  Indeed, Cockerham sent a letter in support of Gadling-Cole's application

less than one week after her request.  (*Id.* at 39.)  Gadling-Cole's citation to the emails

between herself and Cockerham does not demonstrate any adverse action and this evidence

does not support a finding that any white employee was treated differently under similar

circumstances.

The court finds that Gadling-Cole has not demonstrated that she was treated less

favorably than a white employee with regard to Cockerham's recommendation of her

application for a faculty-development grant.  Therefore, summary judgment will be granted

as to this claim.

### iv.  Research assistant terminated

Gadling-Cole argues that she was discriminated against on the basis of her race

because "her grad[uate] assistan[t] was terminated in the middle of one of her projects while

compiling data analysis."  (Doc. 65 at 17 [citing doc. 60-1 at 29 [Gadling-Cole Depo. at

111)].)  In her deposition, Gadling-Cole testified, "I had a student who was serving as my

---

$5,000 faculty development money?

3.   You also need to work on your proposal.  The objective of your proposed
study is to see if grandparents as caregivers of children are aware of available
social services and you plan to publish the results in a journal.  How does your
study contribute to the research literature?  You need to review the literature
and state in your proposal what your study contributes.

(Doc. 60-3 at 40.)  Gadling-Cole responded to this email, indicating that she would make the
changes suggested by Cockerham.  (*Id.*)

[graduate assistant], who was actually working on . . . her master's at the time in sociology. Well, all of a sudden, she was terminated as my [graduate assistant], and I was unclear why."[15]   (Doc. 60-1 at 29 [Gadling-Cole Depo. at 111].)   However, Cockerham testified, "The white research assistant assigned to the Plaintiff was legitimately and properly terminated from the graduate program for having failed two courses in psychology.   Her dismissal was not intended to cover up or balance the termination of a black graduate student who was found to have plagiarized a class paper."   (Doc. 60-3 ¶ 27.)   Gadling-Cole has offered no evidence to indicate that other graduate assistants were not terminated if they were terminated from their graduate program.   Moreover, she has failed to present evidence of any white instructor who was allowed to retain a graduate assistant that had been terminated from his or her graduate program.

The court finds that Gadling-Cole has not demonstrated that she was treated less favorably than a white employee with regard to the termination of her graduate assistant. Therefore, summary judgment will be granted as to this claim.

### v.  Overloaded class

Gadling-Cole argues, "Defendant[ ] admit[s] Plaintiff had an overload of students over the cap, however they have not produced any evidence that other faculty members were

---

[15]Gadling-Cole testified elsewhere in her deposition that her graduate assistant told her she was getting kicked out of the sociology graduate program because "they were covering up the termination of this black student."  (Doc. 60-1 at 30 [Gadling-Cole Depo. at 113].)

over the cap." (Doc. 65 at 17 [citing doc. 60-3 ¶ 45].)  This argument is refuted by the evidence cited by Gadling-Cole, paragraph 45 of Cockerham's Declaration.  In this paragraph, Cockerham testified:

> Neither I nor Dr. Baker was responsible for the enrollment into this online course or the setting of course caps for the Fall, 2011 semester.  The course in question is SW 200, Professional [W]riting, a 200 level 2-credit hour course which has in the past been capped at 25, however was capped at 35 for Fall, 2011.  The only other course capped at 25 is SW 320, which Dr. Baker routinely teaches.  SW 320 is a 300 level 3-credit hour course that is overloaded when needed to accommodate students, as it was overloaded by 2 students in the Fall.  Courses have in the past had varying caps, with some courses occasionally being overloaded as needed to ensure students stay on track for graduation.  All Social Work faculty have at one time had their courses overloaded to accommodate students.  I am personally aware [that] Dr. Baker has taught classes that were overloaded.

(Doc. 60-3 ¶ 45.)

The court finds that Gadling-Cole has not demonstrated that she was treated less favorably than a white employee with regard to teaching an over-booked class.  Therefore, summary judgment will be granted as to this claim.

### vi. Mentoring

Gadling-Cole argues:

. . . Dr. Baker received mentoring that was not available to Plaintiff at UAB.  In fact the record is clear that the people who should have been available to guide Plaintiff were in fact adverse to such as Dr. Mark LaGory.  [(Doc.60-1 at 24-25 [Gadling-Cole Depo. at 92, 93]; Plaintiff Ex. 1 ¶¶ 14, 15.)][16]

---

[16]See, *supra*, note 11.

> Although Plaintiff did have mentors at UAB they were persons Plaintiff had to seek out not just for mentoring. Plaintiff needed mentors just to protect her job.  [(Doc. 60-1 at 24 [Gadling-Cole Depo. at 90]; Plaintiff Ex. 1 ¶¶ 12-18.)][17]  As Plaintiff stated Dr. Baker had mentors and the record will reflect she was aided in publishing by mentors in the department, such as Dr. Sheila Cotton.  [(Doc. 60-2 ¶ 33.)]

(Doc. 65 at 16 [footnotes added].)  The deposition testimony cited by Gadling-Cole does not mention any mentoring program; it refers to LaGory "targeting" her during her pregnancy, (doc.60-1 at 24-25 [Gadling-Cole Depo. at 92-93]), and her discussions with "Dr. Louis Dale" and "Dr. Lucas" regarding retaliation, (*id.* at 24 [Gadling-Cole Depo. at 89-90]). Moreover, Baker's Declaration does not support any reasonable inference that UAB had a mentoring program or that the Board was somehow responsible for any assistance Cotton may have provided to Baker.[18]  (*See* doc. 60-2 ¶ 33.)

_____

[17]See, *supra*, note 11.

[18]Baker testified:

> 32.   At the time I was hired by UAB the Department of Anthropology & Social Work had no formal mentoring process for new faculty members. Similarly, there was no formal mentoring process in the Department of Social Work or the Department of Sociology after they split in 2011.

> 33.   Although there was no formal mentoring process, I did occasionally seek out information and advice from Dr. Sheila Cotton, another faculty member.  The assistance I sought and received from Dr. Cotton was minimal.

> 34.   Nothing prevented or prohibited other faculty members, including the Plaintiff, from seeking information or advice from Dr. Cotton or any other faculty member regarding achieving tenure, publications, community service, professional responsibilities, research funding, submission of grant applications, or similar academic/faculty issues.

The court finds it difficult to imagine that the type of assistance received by Baker from Cotton, at Baker's voluntary initiation, is an employment action of the Board. Regardless, Baker is not similarly situated to Gadling-Cole. Clearly, Baker sought assistance from a colleague; Gadling-Cole has not presented evidence that she also sought such assistance and/or that she was refused help.

The court finds that Gadling-Cole has not demonstrated that she was treated less favorably than a similarly-situated white employee with regard to a mentoring program. Therefore, summary judgment will be granted as to this claim.

### vii.  Non-renewal of employment contract

The Board argues that Baker is not comparable to Gadling-Cole with regard to her record of research, service, and teaching. (Doc. 59 at 15.)  In support of her discharge claim, Gadling-Cole argues, "Plaintiff can support her claim of race discrimination based on the position Dr. Baker was hired for and the Plaintiff hiring regardless of the CV comparisons. When Dr. Baker was hired versus Plaintiff they both were expected to follow the same career path and or tenure-track at UAB." (Doc. 65 at 13-14.)  In support of her argument, Gadling-Cole compares her accomplishments with those of Baker during their first two years of employment.  However, Gadling-Cole and Baker had different supervisors; indeed, Baker was the decision-maker with regard to Gadling-Cole's termination.  "[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable

---

(Doc. 60-2 ¶¶ 32-34.)

claim of discrimination." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001)(citing *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 n.7 (11th Cir.), *opinion modified by* 151 F.3d 1321 (11th Cir. 1998); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1271 (6th Cir. 1986); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 605-06 (8th Cir. 1983)).

Nevertheless, the court assumes that Gadling-Cole can establish a prima facie of race discrimination because "she cannot create a genuine issue of material fact as to whether [the Board's] proffered reasons for firing her are pretext masking discrimination." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)(citing *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002)).

### 4. Articulated Non-discriminatory Reasons and Pretext

The Board asserts the following reasons why Gadling-Cole was terminated:

[1]  Plaintiff had no publications in 2010.  [(Doc. 60-3 at 43-44.)][19]

[2]  Plaintiff was the only tenure-track faculty member in 2010 in the Department of Sociology and Social Work who did not publish anything in 2010. [(*Id.*)]

[3]  Plaintiff had the lowest student course evaluation in 2010 in the Department of Sociology and Social Work for SW 321.  [(*Id.*)]

---

[19]In support of this reason for Gadling-Cole's non-renewal defendant cites Ex. 7, pp. 00502-508.  The Bates-stamped pages are actually found in defendant's exhibit 8, (*see* doc. 60-12 at 55-61), and appear to be plaintiff's resume from 2009.

[4]   Plaintiff was told in her 2010 annual evaluation she needed to publish regularly and make any necessary changes to have consistently good teaching evaluations.  [(*Id.*; doc. 60-15 at 21-25.)]

[5]   Plaintiff's student evaluation scores in 2011 did not exceed the average for the Department of Social Work.  [(Doc. 60-3 at 58; doc. 60-2 ¶¶ 48-49.)]

[6]   Plaintiff had no publications prior to October, 2011.  [(Doc. 60-3 at 59.)]

[7]   Plaintiff's level of contribution during the first ten months of 2011 was the lowest of any serving faculty member in the Department of Sociology and Social Work.  [(*Id.*)]

[8]   Plaintiff was uncooperative in discussing faculty and Department business.  [(*Id.*)]

[9]   Plaintiff's research and scholarship productivity in 2011 was low. [(Doc. 60-2 at 90; doc. 60-15 at 19.)]

[10]   Plaintiff's teaching scores in 2011 were among the lowest in the Department of Social Work.  [(Doc. 60-2 ¶¶ 48-49 and at 90-91, 94; doc. 60-15 at 19.)]

[11]   Plaintiff's service to the Department and interaction with colleagues was subpar.  [(Doc. 60-2 at 91, 94; doc. 60-9 at 58, 62-65.)]

[12]   Plaintiff's participation in the Health Disparities Research Training Program ("HDRTP") was problematic both in attendance and with a grant, and Plaintiff only participated in 60.7% of the Resource Center for Minority Aging Research ("RCMAR") learning sessions.  [(Doc. 60-5 ¶¶ 5-8 and at 7.)][20]

---

[20]Exhibit A to Allman's Declaration, (doc. 60-5 at 7), is an email to Gadling-Cole and states "Based upon feedback from the content reviewers, the RCMAR Executive Committee does NOT endorse submission of your proposal to the Hartford Foundation.  I cannot serve as a mentor for this proposal.  Submission of this proposal will NOT fulfill the requirements of the RCMAR health disparities Research Training Program."  Therefore, it does not

[13]   Plaintiff's participation in the Geriatric Education Center Faculty Scholar Program ("GEC FSP") was poor.  [(*Id.* ¶ 9 and at 9.)][21]

[14]   Plaintiff failed to meet expectations for a tenure-track faculty member.  [(Doc. 60-2 at 91; doc. 60-3 at 59; doc. 60-9 at 58, 62-65; doc. 60-16 at 11-15, 48; doc. 60-17 at 19.)]

(Doc. 59 at 20-22 [footnotes added].)

These reasons, supported by record evidence, are sufficient to meet the Board's

burden of production.

---

support defendant's assertion.   However, Exhibit B, (doc. 60-5 at 9), Allman's email to Baker, specifically states:

> In regard to HDRTP, as we previously discussed, I informed Charnetta by email . . . that her proposal for the Hartford Foundation Geriatric Social Work Program was NOT approved for submission . . . by the [RCMAR] Executive Committee.  I also told her that I could not be a mentor for this proposal.  Her HDRTP mentor met with Charnetta on Monday . . . and told her the proposal was not ready  for submission.  The [HDRTP] mentor told Charnetta that she could not a mentor for the proposal if Charnetta chose to proceed with [the] submission at this time.  The HDRTP mentor also explicitly told Charnetta that she would have to remove the previously drafted letters of support from me and her and replace any references to us as mentors  if Charnetta did choose to submit the proposal despite our objections.  Obviously, this is very upsetting to me and the faculty member that had . . . agreed to help Charnetta as the HDRTP mentor.  Charnetta has attend[ed] 60.7% of the scheduled RCMAR learning sessions.

(*Id.*)

[21]In an email to Baker, Allman of the GEC Faculty Scholar Program noted (1) Gadling-Cole had attended only one conference session, (2) she had missed the last all-day, in-person education session, (3) she did not actively participate in the Group CME Project, and (4) she did not submit her quarterly reports or participate in monthly progress reports with Allman.  (Doc. 60-5 at 9.)  In his email Allman stated that these were program requirements.  (*Id.*)

### 5. Pretext

The law in this circuit is well established:  A plaintiff may not establish pretext merely by quarreling with the wisdom of the alleged discriminatory and/or retaliatory decision. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).  "A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  The relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  *Combs*, 106 F.3d at 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).[22]  When a defendant offers more than

---

[22]In *Combs*, the Eleventh Circuit held:

> In relying on [the comparator's] financial improprieties to undermine [defendant's] explanation that it based its promotion decision on [the comparator's] superior supervisory experience, [plaintiff] confuses *disagreement* about the wisdom of an employer's reason with *disbelief* about the existence of that reason and its application in the circumstances. Reasonable people may *disagree* about whether persons involved in past financial improprieties should be made supervisors, but such potential disagreement does not, without more, create a basis to *disbelieve* an employer's explanation that it in fact based its decision on prior non-financial supervisory experience.  [Defendant's] decision to promote [the comparator] instead of [plaintiff] may seem to some to be bad business judgment, and to

one reason for the challenged action, the plaintiff is entitled to survive summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action.  *Id.* at 1529; *see also Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000))).

"To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons [have] no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision."  *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted). However, "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting

---

others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers.   Stated somewhat differently, **a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer**.

*Combs*, 106 F.3d at 1543 (11th Cir. 1997)(italic emphasis in original; bold emphasis added).

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). "In other words, it does not matter whether the plaintiff is ***actually innocent*** of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer ***believes*** he is guilty." *Masso v. Miami-Dade County*, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007)(emphasis added).[23] "No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken [its] managers, [Title VII ] does not interfere. Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

### a. Plaintiff had no publications in 2010.

In response to this articulated reason for her termination, Gadling-Cole contends, "Plaintiff received notice that she was pregnant in January 2010 and had an extreme[ly] difficult pregnancy with twins being born in September 2010. Plaintiff was on the family medical leave starting in the fall of 2010 and continuing until January 2011. [(Doc. 60-1 at 15 [Gadling-Cole Depo. at 53].)"[24] (Doc. 65 at 18-19.)

---

[23]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

[24]In her cited deposition testimony, plaintiff testified that she had satisfied the condition of her employment contract – to complete her Ph.D. – in November 2010 while she was on family-medical leave:

> Q. . . . On October 14, 2010, had you satisfied the conditions of your

Gadling-Cole's response may show a reason for her lack of publications in 2010, but it does not show that the Board did not rely on this lack of publications, together with the lack of publications in 2011, as a reason for the non-renewal of her contract.  Indeed, in her 2010 evaluation, Cockerham noted that consideration was given for her lack of publications in 2010, and that her "effort should pay off in 2011," (*see* doc. 60-3 at 43), which did not happen.

The court finds that Gadling-Cole has not rebutted this articulated reason for her termination.

### b.   Plaintiff was the only tenure-track faculty member in 2010 in the Department of Sociology and Social Work who did not publish anything in 2010.

Gadling-Cole argues, "Plaintiff had to endure a very difficult pregnancy and was on [F]amily Medical [L]eave for several of months.  During the time Plaintiff was out . . . [she] continued her research and teaching.  Plaintiff had to go through surgeries associated with

---

original hire agreement?

A.  No. That was satisfied November 2010.

Q.  Okay.

A.  While I was still on FML, at that time as well.

(Doc. 60-1 at 15 [Gadling-Cole Depo. at 53].)

the defects and her newborn twins [sic] and return to Howard University to defend her dissertation.  [(Doc. 60-4 ¶ 15.)]"[25]  (Doc. 65 at 19.)

In her 2010 faculty evaluation, Cockerham informed Gadling-Cole that she was "the only tenure-track faculty member in the department who did not publish anything in 2010." (Doc. 60-3 at 43.)  Gadling-Cole has not rebutted this fact.  Moreover, Cockerham noted that in 2010 she was pregnant and that she had defended her dissertation; however, he expected Gadling-Cole to publish in 2011, which she did not do.  Gadling-Cole has not shown that Baker did not rely of her lack of publication as compared to other employees in deciding not to renew plaintiff's contract.

Gadling-Cole has not rebutted this reason for the non-renewal of her contract.

### c.  Plaintiff had the lowest student course evaluation in 2010 in the Department of Sociology and Social Work for SW 321.

Gadling-Cole argues, "Plaintiff did publish and made numerous changes to improve her teaching evaluations.  Plaintiff also attempted to interact with supervisory personnel

---

[25]The cited testimony from DiLorenzo's Declaration provides:

> 15.  Shortly after receiving the October 14, 2010[,] letter [from then Department Chair LaGory terminating her employment for failing to show she had received her Ph.D.], the Plaintiff successfully defended her dissertation for a Ph.D. from Howard University.  She received another letter from Dr. LaGory, dated November 19, 2010, acknowledging this accomplishment and informing her that the Department needed an official transcript and clarification of her teaching schedule for the 2011 Spring semester. . . .

(Doc. 60-4 ¶ 15.)

including Lisa Baker however the atmosphere had become very volatile in the department-based [on] Plaintiff's allegations of racial discrimination.[26]  [(Doc. 60-1 at 33 [Gadling-Cole Depo. at 128].)" [27] (Doc. 65 at 19.)

The undisputed evidence demonstrates that Gadling-Cole had the lowest student evaluations.  The fact the Board did not excuse her low score based on the fact that she made changes to her teaching style does not result in an inference that Baker did not base her decision to terminate Gadling-Cole on her low student evaluations.  Also, Gadling-Cole's

_____

[26]Plaintiff does not have a claim for retaliation.

[27]Plaintiff's testimony at this page of her deposition does not support her assertion that she had published and/or made changes to her teaching methods, or that she had attempted to interact with Baker:

> . . .  However, [Baker] must have been informed something negatively with regards to [Gadling-Cole] because she therein went and met with Dr. Cathy McElderry in her office . . . .  And she was trying to get her to go against me in some realm, and Cathy refused.  So Lisa Baker started crying, stormed out of the office saying[, "]I know whose team you're on now, whose side you're on.["]   And from then on, there were issues with Lisa Baker and Cathy McElderry.  She immediately came in and . . . was just treating us as if we were children, to say the least, the microaggressions that she demonstrated towards both of us.   And then the communications that she had with DiLorenzo because she was our spokesperson at the time, I was not privy to those.  She would send them to Cathy.  Cathy . . . was like[, "]should you have shared this information with [Gadling-Cole].["]   And she was like, ["]well, go ahead and send it to her.["]   . . . [A]nd as I've stated, I know that Lisa Baker had been communicating as had Cockerham with LaGory.  Lisa Baker did share with me that there were a number of negative comments that LaGory shared with her concerning me, and that she didn't go like that, is what she said.   She didn't – until the only time we . . . had dialogue thereafter after submitting my EEOC complaints, that's when it really went down.

(Doc. 60-1 at 33-34 [Gadling-Cole Depo. at 127-29].)

evidence that her work environment was volatile because of retaliation does not rebut the fact that plaintiff had the lowest student evaluation in the Department or that Baker relied on the low scores as one of the reasons to terminate Gadling-Cole. This evidence does not support an inference that the reason for plaintiff's non-renewal was race discrimination.

Therefore, the court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

### d. Plaintiff was told in her 2010 annual evaluation she needed to publish regularly and make any necessary changes to have consistently good teaching evaluations.

Gadling-Cole argues, "Plaintiff after returning to work had engaged in substantial work as it relates to publications and other areas in her [quest] for tenure [(Doc. 60-1 at 21 [Gadling-Cole Depo. at 78].)]"[28] (Doc. 65 at 19.)

In her 2010 evaluation, Cockerham told Gadling-Cole she "need[ed] to publish regularly . . . and be attentive to making any changes [she thought] could be worthwhile in order to have consistently good evaluations." (Doc. 60-3 at 44.) The record is undisputed

---

[28]The deposition testimony cited by plaintiff does not address the amount of work plaintiff engaged in with regard to publishing or improving her student evaluations. (*See* doc. 60-1 at 21 [Gadling-Cole Depo. at 78].) This testimony, during questioning regarding her 2011 evaluation performed by Baker, concerned Baker's failure to note plaintiff's appointment as a scientist at UAB's Centers for AIDS Research and for Aging and something called "Global Scholars" on her 2011 evaluation by Baker; she also complained that Baker did not note she and another professor were working on the protocol for "the International Minority Health and Disparities Research Training Program." (*Id*. at 19, 21 [Gadling-Cole Depo. at 72, 78].)

that Cockerham told Gadling-Cole that she needed to publish in 2011 and to improve her student evaluations.   Gadling-Cole's opinion that her work toward these objectives was "substantial" does not rebut the Board's assertion that Baker relied on this factor in her decision not to renew Gadling-Cole's contract.

Therefore, the court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

### e. Plaintiff's student evaluation scores in 2011 did not exceed the average for the Department of Social Work.

Gadling-Cole argues that her "evaluation scores were only marginal[ly] lower than the other department instructors. [(Doc. 60-2 ¶ 49 [plaintiff's average evaluation score was 3.9; the next lowest score was 4.1; Baker's score was 4.6].)]" (Doc. 65 at 19.)  Obviously, "marginally lower" is still "lower."   Gadling-Cole's contention appears to be that the difference in her student evaluations and those of her colleagues was not enough to warrant her dismissal.   However, this court is not allowed to question the wisdom an employer's decision.  *See Chapman*, 229 F.3d at 1030 (quoting *Elrod*, 939 F.2d at 1470).  Given there is undisputed evidence that Gadling-Cole had once again received the lowest score in the Department and in June 2011 she had been told to make the necessary changes to raise her student evaluations, evidence of the difference between Gadling-Cole's scores and the next-lowest Department member is not sufficient to show that the reason did not actually motivate Baker in her decision not to renew plaintiff's contract.

Therefore, the court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

### f.  Plaintiff had no publications prior to October, 2011.

Gadling-Cole argues, "As of October 2011 Plaintiff had only been employed approximately two years. Plaintiff had gone to a very difficult pregnancy[,] completed her dissertation and had been off several months on the family medical leave.  [(Doc. 60-1 at 15 [Gadling-Cole Depo. at 53].)]"[29]  (Doc. 65 at 19.)

This evidence does not rebut Baker's reason for her decision not to renew plaintiff's contract.   Although Gadling-Cole may believe that she should have received a pass in the publishing requirement based on her pregnancy and defense of her dissertation in 2010, as well as her length of employment, the Board did not agree.  Indeed, in her 2010 evaluation, she was informed that she was required to publish in 2011, yet, she did not publish anything before October 2011.

The court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

### g.  Plaintiff's level of contribution during the first ten months of 2011 was the lowest of any serving faculty member in the Department of Sociology and Social Work.

Gadling-Cole states that she "disagrees" with this articulated reason and that "her contributions were equal to other department members however the department chose to

---

[29]See, *supra*, note 24.

recognize what they consider were important contributions.  [(Doc. 60-1 at 16, 18 [Gadling-Cole Depo. at 59, 66].)]"[30] (Doc. 65 at 20.)

Plaintiff's statement of her opinion, together with her concession that Baker had "recognize[d] what [she] consider[ed to be] important," is insufficient to rebut defendant's articulated reason. *See Green v. City of Northport*, 7:11-CV-2354-SLB, 2014 WL 1338108, *16 (N.D. Ala. March 31, 2014)(quoting *Wilson*, 376 F.3d at 1092).

> ### h.   Plaintiff was uncooperative in discussing faculty and Department business.

Gadling-Cole states that she "disagrees that she was uncooperative in discussing faculty and department business and that the department had become dysfunctional not at the hands of Plaintiff. [(Doc. 60-1 at 33 [Gadling-Cole Depo. at 128].)]"[31]  (Doc. 65 at 20.)

Gadling-Cole's disagreement is insufficient to establish that this articulated reason did not motivate Baker to terminate her.  *See Green*, 2014 WL 1338108, *16 (quoting *Wilson*, 376 F.3d at 1092).

Therefore, the court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

---

[30]In her deposition, plaintiff testified that Cockerham left out her grants from the Center for AIDS Research and her book from her 2011 evaluation. (Doc. 60-1 at 16, 18 [Gadling-Cole Depo. at 59, 66].)   However, plaintiff has not directed the court to any evidence that her book was published before October 1, 2011.

[31]See, *supra*, note 27.

### i.  Plaintiff's research and scholarship productivity in 2011 was low.

Gadling-Cole states that she "disagrees that her research and scholarship productivity in 2011 was low. [(Doc. 60-1 at 16, 18 [Gadling-Cole Depo. at 59, 66].)]"[32]  (Doc. 65 at 20.)

Again, plaintiff's disagreement with the articulated reason is not sufficient evidence to rebut this reason or to otherwise show that it did not motivate the Board.  *See Green*, 2014 WL 1338108, *16 (quoting *Wilson*, 376 F.3d at 1092).  Moreover, the cited deposition testimony does not raise an inference that Baker did not rely on this reason in making her decision to terminate plaintiff.

### j.  Plaintiff's teaching scores in 2011 were among the lowest in the Department of Social Work.

Gadling-Cole argues, "Plaintiff agrees that her teaching scores were among the lowest in the department and states the composition of the class is a vital element of those scores." (Doc. 65 at 20.)  She, therefore, has admitted the truth of this articulated reason.  Also, she has offered no citation to record evidence to show that this articulated reason did not motivate Baker not to renew her contract.

Therefore, the court finds that Gadling-Cole has not rebutted this reason for her non-renewal.

---

[32]See, *supra*, note 30.

**k.  Plaintiff's service to the Department and interaction with colleagues was subpar.**

Gadling-Cole "disagrees" with this articulated reason and she states that she "interacted with her colleagues more than Dr. Baker.  [(Doc. 60-1 at 33 [Gadling-Cole Depo. at 128].)]"[33]  (Doc. 65 at 20.)

The cited testimony does not rebut the articulated reason or support an inference that Gadling-Cole interacted with her colleague more than Baker did.   Again, plaintiff's disagreement with the articulated reason is not sufficient evidence to rebut this reason or to otherwise show that it did not motivate Baker.

**l.  Plaintiff's participation in the Health Disparities Research Training Program ("HDRTP") was problematic both in attendance and with a grant, and Plaintiff only participated in 60.7% of the Resource Center for Minority Aging Research ("RCMAR") learning sessions.**

"Plaintiff disagrees that her participation in the Health Disparities Research Training Program ("HDRTP") was problematic.   This position was voluntary and there were no

---

[33]See, *supra*, note 27.

guidelines for participation.  [(Doc. 60-1 at 19 [Gadling-Cole Depo. at 71, lines 18-23].)]"[34] (Doc. 65 at 20.)

Plaintiff's disagreement is insufficient to rebut this reason, particularly in light of Baker's receipt of an e-mail from Richard Allman, head of these programs, in which he stated that Gadling-Cole had "not been fulfilling the requirements of [the] program."  (Doc. 60-5 at 9.)  This e-mail shows that Allman believed that the HDRTP had requirements and that Gadling-Cole's participation did not fulfill the program's requirements.  (*Id.*)   Gadling-Cole has not presented any evidence that Baker did not rely upon this information from Allman in making her decision not to renew Gadling-Cole's contract.

Therefore, the court finds that Gadling-Cole has not rebutted this articulated reason for her non-renewal.

---

[34] Plaintiff's deposition testimony at these lines is as follows:

. . .  Because I had a number of service[s] . . . that I was involved in throughout the Center for Aids Research, through the Center for Aging, through developing the office of Global Social Service Research, which she fought left and right.  So, yes, this is basically in retaliation to the fact that I have filed the EEOC complaints.

(Doc. 60-1 at 19 [Gadling-Cole Depo. at 71, line 18, to 72, line 2].)  This testimony does not support plaintiff's contention that HDRTP did not have guidelines for participation.

**m.   Plaintiff's participation in the Geriatric Education Center Faculty Scholar Program ("GEC FSP") was poor.**

Gadling-Cole, again, "disagrees" with the defendant's articulated reason.  (*See* doc. 6 at 20.)  She contends, "The position was voluntary and there were no guidelines for participation.  [(Doc. 60-1 at 19 [Gadling-Cole Depo. at 71, lines 18-23].)"[35]  (Doc. 65 at 20.)

Like the articulated reason based on the HDRTP, Baker's articulated reason was based on information from Allman that Gadling-Cole failed to meet the obligations of the position in the GEC Faculaty Scholar Program – including that she (1) only attended one of the required conference sessions, (2) failed to attend a required in-person education session, (3) failed to participate in her group continuing education project newsletter, and (4) failed to submit quarterly progress reports and communicate with Allman on a monthly basis regarding the program's progress.  (Doc. 60-5 at 9.)  Obviously, Allman did not consider attendance and participation to be voluntary and unstructured.  Moreover, he communicated his displeasure with Gadling-Cole to Baker and there is no evidence that Baker did not consider his complaints in making her decision not to renew plaintiff's contract.

Therefore, the court finds that Gadling-Cole has not rebutted this articulated reason for her termination.

---

[35] See, *supra*, note 34.

**n. Plaintiff failed to meet expectations for a tenure-track faculty member.**

Gadling-Cole argues, "Plaintiff disagrees that she failed to meet expectations for a tenure-track faculty member. Plaintiff's progress during the same time frame was equal to or greater than Dr. Baker." (Doc. 65 at 21.)

Her disagreement notwithstanding, for the reasons set forth above, which will not be repeated here, the court finds that Gadling-Cole has not shown that she met Baker's expectations for a tenure-track faculty member.

Based on the foregoing, the court finds that Gadling-Cole has not presented evidence sufficient for the court to find that each articulated reason for her termination is unworthy of credence and that the real reason was her race. Therefore, defendant's Motion for Summary Judgment will be granted as to plaintiff's termination claim.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment, (doc. 58), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 23rd day of September, 2015.

_Sharon Lovelace Blackburn_
SHARON LOVELACE BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE